**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ERIC WIEGAND Derivatively on Behalf of CLOVER HEALTH INVESTMENTS, CORP., | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| VIVEK GARIPALLI, ANDREW TOY, JOSEPH WAGNER, LEE SHAPIRO, CHAMATH PALIHAPITIYA, STEVEN TRIEU, IAN OSBORNE, JACQUELINE D. RESES, JAMES RYANS, NATHANIEL S. TURNER, | ) ) ) ) Case No. ) ) ) ) |
| Individual Defendants, | ) ) |
| -and- | ) ) ) |
| CLOVER HEALTH INVESTMENTS, CORP., a Delaware corporation, | ) ) ) ) |
| Nominal Defendant. | ) ) ) |

---

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Eric Wiegand ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal

1

knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.       This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Clover Health Investments, Corp. (referred to herein as "Clover", or the "Company")[1] against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Clover's reputation, goodwill, and standing in the business community and has exposed Clover to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Clover in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.       This action seeks to remedy wrongdoing committed by Clover's directors and officers from October 6, 2020 through the present (the "Relevant Period").

3.       In October 2020, Clover went public by merging with a special purpose acquisition company, Social Capital Hedosophia Holdings Corp. III ("SCH"). The merger occurred on January 7, 2021 (the "Merger").

4.       During the Relevant Period, including prior to the Merger, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to

---

[1] The Civil Investigative Demand (defined below) defines "Clover" to mean "Clover Health Investment Corporation, Clover Health LLC, Clover Health Corp., Clover Insurance Company, and Clover health Holdings, Inc., including their affiliates, subsidiaries, predecessors, and successors."

make a series of materially false and misleading statements and material omissions that failed to disclose, amongst other things, that: (1) the Company had made improper payments to healthcare providers in violation of federal anti-kickback laws; (2) the company had developed software that aided Clover's practice of defrauding the federal government by unlawfully overbilling; (3) the Company had engaged in the deceptive sales practices of a subsidiary to mislead seniors and induce them to purchase healthcare plans; (4) Clover had engaged in undisclosed related party transactions with a field marketing organization,  Seek Insurance Services, Inc. ("Seek Insurance"), which was responsible for most of Clover's sales; (5) Clover had received a Civil Investigative Demand from the United States Department of Justice ("DOJ"), which posed a threat to the Company in relation to the aforementioned issues, as Clover generated a substantial portion of its revenue from Medicare; (6) the Company intentionally obscured that a significant amount of Clover's sales had been driven by Seek Insurance; (7) the Clover Assistant software (defined below) was rudimentary; and (8) the Company failed to maintain internal controls. As a result of the enumerated misconduct (the "Misconduct"), the Company's public statements were materially false and misleading at all relevant times.

5.      The Individual Defendants (as defined below) breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

6.      As detailed herein, and as alleged in the ongoing consolidated federal securities class action in the Middle District of Tennessee styled *Bond v. Clover Health Investments, Corp. et al.* Case No., 3:21-cv-96 (the "Federal Securities Class Action"), Clover's officers and directors

substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

9.      Venue is proper in this District because Clover is incorporated in this District, a large portion of the wrongdoing and issues alleged herein occurred in this District, and the Defendants activities have had an effect in this District.

## THE PARTIES

### Plaintiff

10.      Plaintiff Eric Wiegand is and has continuously been a stockholder of Clover during the wrongdoing complained of herein.

### Nominal Defendant

11.      Nominal Defendant Clover is a Delaware corporation with its principal executive offices at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067. Clover stock trades on the NASDAQ under the ticker symbol "CLOV." Before the Merger, Clover's stock, units, and warrants traded on the NYSE under the ticker symbols "IPOC," "IPOC.U," and "IPOC.WS,"

respectively.

**Individual Defendants**

12.     Defendant Vivek Garipalli ("Garipalli") is the co-founder of Clover and has served as Clover's Chief Executive Officer ("CEO") and as a Company director since the Merger in January 2021Prior to the Merger, Defendant Garipalli served as Clover's President from July 2014 until March 2019. He is a named defendant in the Federal Securities Class Action.

13.     Defendant Andrew Toy ("Toy") has served as Clover's President, Chief Technical Officer ("CTO"), and Company director since January 2021. Prior to the Merger, he held those same positions from March 2019, February 2018, and November 2018, respectively, until the Merger in January 2021. Toy is a named defendant in the Federal Securities Class Action.

14.     Defendant Joseph Wagner ("Wagner") has served as Clover's Chief Financial Officer ("CFO") since the Merger in January 2021. On July 15, 2021, the Company announced Wagner will leave the Company on August 13, 2021. Prior to the Merger, he held the same position with Clover from January 2020 until the Merger in January 2021. Wagner is a named defendant in the Federal Securities Class Action.

15.     Defendant Lee Shapiro ("Shapiro") has served as a Company director since the Merger in January 2021. He also serves as the Chair of the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee.

16.     Defendant Chamath Palihapitiya ("Palihapitiya") served as SCH's CEO and as the Chairman of the Board from October 2019 until the Merger in January 2021. Since the Merger, Defendant Palihapitiya has served as a senior advisor to Clover's management and is a named defendant in the Federal Securities Class action.

17.     Defendant Steven Trieu ("Trieu") served as SCH's CFO from January 2020 until the Merger in January 2021.

18. Defendant Ian Osborne ("Osborne") served as SCH's President from January 2020 and as a director of the Company from October 2019 until the Merger in January 2021.

19. Defendant Jacqueline D. Reses ("Reses") served as a director of SCH from April 2020 until the Merger in January 2021.

20. Defendant James Ryans ("Ryans") served as a director of SCH from 2020 until the Merger in January 2021. He also served as the Chair of the Company's Audit Committee from 2020 until the Merger in January 2021.

21. Defendant Nathaniel S. Turner ("Turner") has served as a Company director since the Merger in January 2021. He also served as a member of the Audit Committee and as a member of the Talent and Compensation Committee. Prior to the Merger, he served as a Clover director from April 2015 until the Merger in January 2021.

22. Collectively Individual Defendants Garipalli, Toy, Wagner, Shapiro, Palihapitiya, Trieu, Osborne, Reses, Ryans, and Turner are referred to herein as the "Individual Defendants."

23. The Individual Defendants, because of their positions with Clover, possessed the power and authority to control the contents of Clover's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Clover operates as a Medicare Advantage insurer in the United States. The Company, through its Clover Assistant software platform, provides preferred provider organization and health maintenance organization health plans for Medicare-eligible consumers. The Clover Assistant software, according to Clover's website, is a software program which helps primary care doctors get a more complete view of the patient's overall health ("the Clover Assistant software"). Clover was founded in 2014 and is headquartered in Franklin, Tennessee.

25.    Diagnostic coding is the translation of written descriptions of diseases, illnesses and injuries into codes from a particular classification. In medical classification, diagnosis codes are used as part of the clinical coding process alongside intervention codes. During the Relevant Period, Clover paid healthcare providers $200 per visit to use the Clover Assistant platform so that Clover could exaggerate patients' illnesses and thus increase the diagnosis code to ensure Clover received the maximum reimbursement from the government. Clover would provide untraceable gift cards to healthcare providers to encourage them to have patients choose Clover healthcare plans. Clover's gift card payments breached Medicare Communications and Marketing's Guidelines, which prohibited a provider from "urg[ing]" or "attempt[ing] to persuade" their patients to enroll in a specific Medicare Advantage plan based on "financial" or "any other interests" of the provider.

26.    Further, as was later revealed, Clover also provided kickback payments to healthcare providers' staff in exchange for referring patients, thus channeling customers to the Company's healthcare plans for senior citizens. The Company also took advantage of the Medicare Advantage payment model to unlawfully engage in overbilling practices. Clover's software was designed to assign and recognize patients so that they seem as sick as possible and thereby earn a

higher payment rate in accordance with the Centers for Medicare & Medicaid Services' ("CMS") practice of increasing payments for patients with a higher "risk assessment" score.

27.    During the Relevant Period, Clover's wholly owned subsidiary, Seek Insurance, failed to disclose its connection to Clover while misleadingly advertising itself to unwitting consumers. Although Clover owns Seek Insurance, Seek Insurance's website misleadingly exclaims "[w]e don't work for insurance companies. We work for you." Seek Insurance's website has a blog post describing itself as remaining "neutral" and its business as "impartial[.]"

28.    Additionally, a large portion of the Clover's revenues come from the insurance firm, B & H Assurance, LLC ("B&H"), which is controlled by the Company's chief salesperson, Hiram Bermudez ("Bermudez").  This relationship was not disclosed to investors, and Bermudez never resigned from B&H, continuing to negotiate sales for the Company. Although this involvement was sometimes indirect, Bermudez's ongoing involvement in sales was largely concealed. Clover did not disclose its relationship with Bermudez to the National Association of Insurance Commissioners ("NAIC"). Rather, deceptively, the only business entity association listed for B&H with NAIC is with Yesenia Rivera, Bermudez's wife.

**Disclosure Obligations**

29.    SEC Regulation S-K requires public companies, such as Clover, to make certain disclosures regarding their finances and operations. Under Regulation S-K, items 303 and 503, Individual Defendants were required to disclose the Misconduct and the DOJ investigation, as these facts were: (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Clover speculative or risky, and thus required disclosure under the aforementioned provisions.

8

**The Individual Defendants False and Misleading Statements**

30.    On October 6, 2020, Clover published a press release wherein it announced its intention to go public by way of a reverse merger with SCH with a valuation of $3.7 billion. In relation to the Merger, Clover's business, and the Clover Assistant, the press release noted:

- Clover is a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses

- A unique model in health insurance, Clover partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care

- The transaction is expected to fuel Clover's trajectory as one of the nation's fastest growing Medicare Advantage plans

- Transaction values Clover at an enterprise value of $3.7 billion and is expected to provide up to $1.2 billion in cash proceeds, including a fully committed PIPE of $400 million and up to $828 million of cash held in the trust account of Social Capital Hedosophia Holdings Corp. III ("SCH")

- PIPE led by $100 million from Chamath Palihapitiya, Founder and CEO of SCH, and $50 million from Hedosophia, as well as commitments from Fidelity Management & Research Company, LLC., and funds affiliated with Jennison, Senator Investment Group LP, Casdin and Perceptive Advisors

- Clover is expected to receive up to $728 million of transaction proceeds, and up to $500 million of cash proceeds is expected to be allocated to existing Clover shareholders

. . . Clover Health Investments, Corp. ("Clover" or "the Company"), which operates next-generation Medicare Advantage plans, has entered into a definitive agreement to become publicly traded via a merger with Social Capital Hedosophia Holdings Corp. III ("SCH") (NYSE: IPOC), a special purpose acquisition company. Upon closing, the transaction will support Clover's mission to improve every life, providing significant capital for the Company to scale and improve health outcomes for seniors across the United States.

31.    The press release continued to describe Clover's distinguishing characteristics and benefits and boasted about Clover Assistant, stating:

Founded in 2013, Clover has pioneered a fundamentally different approach to Medicare Advantage that focuses on driving affordability and partnering closely with physicians to deliver the best possible health outcomes for members. The Company offers affordable Medicare Advantage plans to eligible individuals, giving consumers access to broad and open healthcare networks, rich supplemental benefits and low out-of-pocket expenses.

***

Technology is at the core of Clover's business – the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software to assist physicians with clinical decision-making at the point of care.

Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes.

The Clover Assistant enables a virtuous growth cycle, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. In turn, the Company believes its best-in- class plans will continue to deliver market-leading growth, allowing the Clover Assistant to capture and synthesize more data and ultimately drive better care.

Medicare Advantage is one of the largest and fastest growing markets in the U.S. healthcare system – but it is one that has seen little innovation and remains ripe for disruption. Worth $270 billion today and with an estimated value of $590 billion by 2025, the Medicare Advantage market provides a tremendous opportunity for growth.

Today, Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach, Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare-eligibles in eight Georgia counties.

Clover's management team, led by CEO and Co-Founder Vivek Garipalli and President and Co-Founder Andrew Toy, will continue to lead Clover following the transaction. Chamath Palihapitiya, Founder and CEO of SCH, will act as a senior advisor to the Company's management.

32. Further, in the press release, Defendants Garipalli, Toy, and Palihapitiya boasted about Clover's benefits:

**Management Comments**

"I launched Clover eight years ago to fix fundamental flaws in our healthcare system, including unequal access, abysmal customer service and wasteful spending. Chamath and the SCH team are fervent believers and true champions of Clover's mission to improve every life," said Garipalli. "Our philosophy is that everyone should be able to afford great healthcare. The Clover team empowers physicians to deliver the best possible outcomes for our members, and the Clover Assistant does just that by delivering vital clinical insights to physicians at the point of care."

"We have made it our business to make healthcare affordable. Our technology helps doctors, leading to better outcomes and lower out-of-pocket expenses for members," said Toy. "I believe that more and more doctors are embracing the Clover Assistant because it allows them to focus on what they want to do, which is to look after patients. Importantly, the platform is powered by a closed feedback loop, linking clinical data and physician action, which improves continuously as membership grows, allowing us to constantly evolve new ways of helping physicians and their patients."

Palihapitiya said, "We need companies like Clover to help fix our broken healthcare system. The Company's rapid growth is a testament to the effectiveness of its tech-enabled approach, which resonates powerfully with consumers and physicians alike. I believe Clover is uniquely positioned to disrupt the entire Medicare Advantage market as well as expand into new and exciting opportunities in Original Medicare. I am proud to partner with Vivek, Andrew and the entire Clover team on the next phase of their mission to improve lives across the country."

33. The same day, on CNBC's "Squawk Box," Defendant Palihapitiya boasted about Clover's "transparency," expressing that the Company "create[s] transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid."

34. Also on October 6, 2020, Clover Health, together with SCH, filed a prospectus on

Form 425 with the SEC that attached the Merger Agreement. The Merger Agreement was signed by Defendants Garipalli and Palihapitiya and stated, with regard to "Healthcare Compliance": "[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, **has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program [.]**" (Emphasis Added).

35.     The Merger Agreement stated, "[s]ince January 1, 2018 … (iii) each of [Clover] and its Subsidiaries has implemented and maintained a compliance program, including policies, procedures and training, intended to ensure compliance with all applicable Health Care Laws…"

36.     On October 20, 2020, Clover filed the Registration Statement with the SEC in connection to the Merger ("the Registration Statement").  The Registration Statement was signed or approved by defendants Palihapitiya, Trieu, Osborne, Reses, and Ryans. With reference to the Merger, the Registration Statement said that Clover had discussions with SCH regarding "typical due diligence" and that from August 25-28, 2020, together with their Counsel, they, "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business." Specifically, the Registration Statement stated that on August 27, 2020, SCH's legal counsel were "provided with access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover" and that the Company had discussed due diligence in respect of the Merger.

37.     The Registration Statement stated the following regarding SCH's due diligence endeavors:

> The SCH board of directors considered the scope of the due diligence conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to Clover, including: (a) extensive virtual meetings and calls with Clover's

management team regarding its operations, projections and the proposed transaction; and (b) review of materials related to Clover and its business, made available by Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

38.    With respect to Clover's business model, the Registration Statement stated:

At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next- generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable – offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co- pays, drug deductibles and drug costs in their markets – and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data- driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

* * *

We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of - 44 of legacy medical record software products, including EHRs

such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

* * *

As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans. We strive to continuously lower our members' out- of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits. . .

39.    With respect to Clover's increasing membership numbers and revenues, the

Registration Statement said:

We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

* * *

As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5

million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase. During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1) % and (38.3) %, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2) %. Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19.

* * *

We've already seen a glimpse of what's possible. Clover currently offers Medicare Advantage plans in 7 states and 34 markets. Our "obvious" plans are among the most affordable in their markets. They generally offer the widest physician networks. As a result, they benefit from industry-leading organic growth, with a 38% annual growth rate compared to an 8% industry average.

40.    With respect to Physicians using the "Clover Assistant," the Registration Statement said:

The Clover Assistant delights and engages physicians. We are focused on empowering and delighting physicians that use our platform. Physicians are highly satisfied with the Clover Assistant platform, as evidenced by our platform's positive NPS of 64 for the three months ended June 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic and NextGen. Onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

41.    The Registration Statement explained how Clover's plans stand out in the industry:

The SCH board of directors believes that Clover provides a fundamentally different approach to insurance, offering highly affordable, best-in-class plans that combine wide access to healthcare and supplemental benefits with low out of-pocket expenses. Clover designs its plans to provide the access of a PPO at lower than HMO costs. Most of its members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays,

specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with wide network access and with the same in-and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long- term care services in 2016. The SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care.

42.    Under the heading "Government Regulation," the Registration Statement stated that:

[w]e work diligently to ensure compliance with all applicable laws and regulations.

***

Our operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.

43.    In relation to "Legal Proceedings," the Registration Statement stated that at that time the Company was "not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

44.    Under the heading "Litigation and Proceedings," the Merger Agreement, attached to Registration Statement, read:

Section 4.10. <u>Litigation and Proceedings</u>. Except as set forth on Section 4.10 of the Company Disclosure Letter, as of the date hereof, (a) there are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions

16

(including any investigations or inquiries initiated, pending or threatened) by any Governmental Authority, or other proceedings at law or in equity (collectively, "Legal Proceedings"), against the Company or any of the Company's Subsidiaries or their respective properties or assets; and (b) there is no outstanding Governmental Order imposed upon the Company or any of the Company's Subsidiaries; nor are any properties or assets of the Company or any of the Company's Subsidiaries' respective businesses bound or subject to any Governmental Order, except in the case of each of clauses (a) and (b), as would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole.

45.    With respect to the disclosure letters referenced in Section 4.10, the Merger Agreement claimed that they "are not publicly filed," and that the Company "did not believe that the disclosure letters contain information that is material to an investment decision."

46.    Under the heading "Legal Compliance," the Merger Agreement stated:

Section 4.11. Legal Compliance.

(a)    Each of the Company and its Subsidiaries is, and for the prior five (5) years has been, in compliance in all material respects with applicable Law.

(b)    The Company and its Subsidiaries maintain a program of policies, procedures, and internal controls reasonably designed and implemented to (i) prevent the use of the products and services of the Company and its Subsidiaries in a manner that violates applicable Law (including money laundering or fraud), and (ii) otherwise provide reasonable assurance that violations of applicable Law by any of the Company's or its Subsidiaries' directors, officers, employees or its or their respective agents, representatives or other Persons, acting on behalf of the Company or any of the Company's Subsidiaries, will be prevented, detected and deterred.

(c)    Neither the Company nor any of its Subsidiaries or any of the officers, directors or employees thereof acting in such capacity has received any written notice of, or been charged with, the violation of any Laws, except where such violation has not been, individually or in the aggregate, material to the Company and its Subsidiaries.

47.    Under the heading "Risk Factors," the Registration Statement stated:

From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought

by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

***

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti- Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "Risk factors— Risks

Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

\* \* \*

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

48.    The "Risk Factors" section of the Registration Statement also stated, with respect to possible litigation flowing from the submission of false claims to the federal government:

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

49.     Under the heading "Sales and Marketing," the Registration Statement stated:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

50.     In respect of the "risk adjustment model," the Registration Statement stated:

When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each

year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer- oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

51.     On November 19, 2020, the Company filed a Form 8-K containing an analyst presentation with the heading, "Clover Health A Deeper Dive". The presentation boasted about Clover's "Virtuous Growth Cycle" and noted "Physicians value the Clover Assistant." The presentation stated, "[i]n ~2 years since product launch, we've built a broad base of engaged physicians. Given our software-driven approach, we believe we can scale these results rapidly within existing and new markets." The presentation also said that physicians were "[i]ncentivized to use [Clover's] highly delightful tech platform . . . that suggests personalized care recommendations at the point of care" and that the Clover Assistant was "[d]esigned to work with any PCP and remove financial concerns from clinical decision-making."

52.     On January 7, 2021, the Company issued a press release announcing the closing of the Merger. In the press release, Defendant Garipalli said "[a]s a public company, we will continue to pioneer a fundamentally different approach in the Medicare Advantage and Medicare space – investing in technology and partnering closely with physicians to help them make critical decisions for their patients at the point of care – with an overarching commitment to creating value for all stakeholders."

53.     On January 13, 2021, the Company filed the Secondary Public Offering ("SPO") Registration Statement on Form S-1 with the SEC related to the resale of Class A Clover common stock and warrants by certain Defendants, including Garipalli, Palihapitiya, Wagner, Toy, Osborne, Reses, Ryans, and Turner. Regarding the Company's business strategy, the SPO Registration Statement stated, with respect to its healthcare plans:

> At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next- generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable – offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co- pays, drug deductibles and drug costs in their markets – and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data- driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

54.     The SPO Registration Statement also boasted about the Clover Assistant and the advantage that it provides the Company, stating:

> We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is

> comparable to those of leading consumer technology platforms, such as
> Netflix and Amazon, and stands in stark contrast to the average negative
> NPS of -44 of legacy medical record software products, including EHRs
> such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded
> physicians are highly engaged, using the Clover Assistant for 92% of their
> member visits in 2019.

* * *

> As the improved care made possible by the Clover Assistant results in
> improved plan economics, we are able to return a material portion of our
> savings to members through our "Obvious" plans. We strive to continuously
> lower our members' out-of-pocket costs and provide them with market-
> leading benefits. Most of our members are enrolled in plans that offer the
> lowest average out-of-pocket costs for PCP co-pays, specialist co-pays,
> drug deductibles and drug costs in their markets while also providing peace
> of mind with broad network access and with the same in- and out-of-
> network costs for physician visits…

55.     The SPO Registration Statement highlighted Clover's "organic membership
growth," and its recent "infrastructure" which, together with a decrease in healthcare utilization,
yielded "improved results," stating:

> As a result of our "Obvious" plans, we have achieved significant organic
> membership growth. Our membership has expanded from 30,677 as of
> January 1, 2018, to 57,503 as of September 30, 2020, representing 25%
> share of the individual, non-SNP MA market in our established markets,
> which we define as markets where an insurer has over 500 members as of
> the end of the prior year. This expansion has largely been driven by our
> nation-leading established market take rate, which has averaged more than
> 50% over the past three years across a group of counties in New Jersey that
> grew from eight to 13 over the period. Established market take rate is
> derived from publicly available CMS data and represents the number of
> members gained by an insurer as a percentage of the total number of
> incremental MA members added to comparable plans in established
> markets. This rapid growth generated a 59.1% increase in our total revenues
> from $290.6 million for the year ended December 31, 2018, to $462.3
> million for the year ended December 31, 2019, and our gross premiums
> earned, before the impact of premiums ceded to third party reinsurers under
> reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million
> over the same period. For the nine months ended September 30, 2020, our
> total revenues were $506.7 million and gross premiums earned were $501.5
> million as compared to $347.0 million in total revenues and $344.3 million
> in gross premiums earned for the nine months ended September 30, 2019,
> in each case, representing a 46% increase. During 2018 and 2019, we also

built the infrastructure to deliver on a more efficient healthcare experience for our members, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19.

56.     Pertaining to the Company's business model, the SPO Registration Statement highlighted the following:

At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next- generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable—offering most of our   members   the lowest   average out-of-pocket costs   for   PCP co- pays, specialist co-pays, drug deductibles and drug costs in their markets—and provide peace of mind with wide network access and the same cost-sharing (co- pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision- making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare

Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

* * *

We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for

caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of - 44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

\* \* \*

As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans. We strive to continuously lower our members' out- of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits. . .

57.    In relation to Clover's growth, the SPO Registration stated:

We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

\* \* \*

As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established

25

markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase. During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19.

58.     Regarding physicians using the Company's "Clover Assistant" platform, the SPO Registration Statement stated, in pertinent part, that:

> The Clover Assistant delights and engages physicians. We are focused on empowering and delighting physicians that use our platform. Physicians are highly satisfied with the Clover Assistant platform, as evidenced by our platform's positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic and NextGen. Onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

59.     Under the heading, "Government Regulation," the SPO Registration Statement stated "[w]e work diligently to ensure compliance with all applicable laws and regulations." The SPO Registration Statement further read:

> [The Company's] operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, and from time to time we receive subpoenas and other requests for information from,

federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.

60.     With respect to "Legal Proceedings," the SPO Registration Statement claimed that the Company was "not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

61.     Under the heading "Risk Factors," the SPO Registration Statement stated:

> From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV"), audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

> * * *

> There has been increased government scrutiny and litigation involving MA

27

plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti- Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

\* \* \*

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a

violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti- Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

62.     Under the heading "Sales and Marketing," the SPO Registration Statement stated:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels

provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

63.    In relation to Clover's "risk adjustment model," the SPO Registration Statement stated:

> When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer- oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

64.    On January 27, 2021, the Company filed with the SEC on Form 8-K a current report. The current report attached a presentation with the heading "Insurance & Retail: Healthcare's Odd Couple," and said that Clover had "prepared slides for use in connection with its presentation at an industry conference on January 27, 2021." The presentation explained that "Clover lowers barriers to care". Further, the presentation misleadingly claimed that "Clover Assistant gives providers a holistic view of a patient's health" when the Clover Assistant was not providing a true picture of the patient's health at all, for the reasons outlined herein.

65.    The statements and omissions referenced above were materially false and

misleading. Specifically, the Individual Defendants failed to disclose: (1) the Company made improper payments to healthcare providers in violation of federal anti-kickback laws; (2) the company developed software that aided Clover's practice of defrauding the federal government by unlawfully overbilling; (3) the Company engaged in the deceptive sales practices of a subsidiary to mislead seniors and induce them to purchase healthcare plans; (4) Clover engaged in undisclosed related party transactions with a field marketing organization Seek Insurance, which was responsible for most of Clover's sales; (5) Clover had received a Civil Investigative Demand from the DOJ, which posed a threat to the Company in relation to the aforementioned issues as Clover generated a substantial portion of its revenue from Medicare; (6) a significant amount of Clover's sales had been driven by Seek Insurance and the Company intentionally obscured this fact; (7) the Clover Assistant software was rudimentary; and (8) the Company failed to maintain internal controls.

### **The Truth Emerges**

66.    On February 4, 2021, Hindenburg Research released the Hindenburg Report titled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation" ("The Hindenburg Report"). The report revealed that, after a four-month long investigation of the Company that involved "more than a dozen interviews with former employees, competitors, and industry experts, dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials," Hindenburg Research had found that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

67.    The Hindenburg Report stated that "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation

by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained" and that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor." The Hindenburg Report noted that, accordingly to it its research, "the [DOJ] investigation has merit."

68.     The Civil Investigative Demand issued by the DOJ to Clover, which was provided in the Hindenburg Report, showed that the DOJ had initiated a "False Claims Act investigation" generally regarding "whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal agencies." According to the Civil Investigative Demand, the DOJ requested information from Clover related to the Misconduct.

69.     The Hindenburg Report also disclosed that:

Clover claims that its best-in-class technology fuels its sales growth. **We found that much of Clover's sales are driven by a major undisclosed related party deal and misleading marketing targeting the elderly. These practices should not come as a surprise, given that in 2016, Clover was fined for misleading marketing practices by the Centers for Medicare & Medicaid Services (CMS). The fine was issued after Clover's repeated failure to amend misleading statements about its plan offerings.** A former employee told us the fine was so small it just emboldened Clover to push the envelope further.

(Emphasis Added).

70.     The Hindenburg Report also noted that Seek Insurance, the Company's scarcely disclosed subsidiary, has "no mention of its relationship with Clover on its website yet misleadingly advertises to seniors that it offers 'independent' and 'unbiased' advice on selecting Medicare plans." Further, the Hindenburg Report highlighted that Seek Insurance asserts, "'We don't work for insurance companies. We work for you', [sic]," despite the fact that Seek Insurance

is owned by Clover, an insurance company, and is thus not at an arm's length from an insurance company. The report also noted that Seek Insurance's business was also "under investigation by the DOJ."

71.     The Hindenburg Report explained that multiple former Clover employees reported that, "much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez." Specifically, one former employee interviewed by Hindenburg opined that "Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship." Another former employee that Hindenburg Research interviewed said "Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name 'for compliance purposes'. Insurance filings confirm this. The Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement."

72.     It was revealed in the Hindenburg Report that the DOJ was probing into upcoding, or the practice of overbilling Medicare, at Clover. According to the Hindenburg Report, **"[m]ultiple former employees explained that Clover's software is primarily a tool to help the company increase coding reimbursement."** (Emphasis Added).

73.     Further, the Hindenburg Report asserted that "according to doctors and former employees we interviewed, [physicians] use [Clover's software] because **Clover pays them extra to use it. Physicians are paid $200 per visit to use the software, twice the normal reimbursement rate for a Medicare visit."** (Emphasis Added). Hindenburg Research's investigation also turned up that "[d]octors at key Clover providers described the software as 'embarrassingly rudimentary', 'a waste of my time' and as just another administrative hassle to deal with." (Emphasis Added).

74.     Soon after the Hindenburg Report was released, the Company's share price fell $1.72, or approximately 12.3% on February 4, 2021. Additionally, the Company's warrant price closed at $3.39 per warrant on February 4, 2021, a $0.18 drop, or approximately 5%.

75.     On February 5, 2021, prior to the market's open, Clover was forced to finally reveal the Misconduct and filed a current report on Form 8-K with the SEC which disclosed that the SEC had started an investigation and requested that the Company preserve documents and data related to certain issues referenced in the Hindenburg Report from the period of January 1, 2020 to the present.

76.     On this news, the Company's share price fell a further $0.53 per share, or around 4.3%, in intraday trading on February 5, 2021. Additionally, the Company's warrant price fell a further $0.28 per warrant, or around 8.2%, in intraday trading on February 5, 2021.

**The False and Misleading Proxy**

77.     On December 14, 2020, the Company filed a Schedule 14a with the SEC, which contained a Notice of Shareholder Meeting (by order of the Board) and Proxy Statement (the "Proxy")[2] for the purposes of soliciting shareholder approval of the Merger.

78.     First, with respect to the Company's Code of Conduct, the Proxy stated that Clover "will have a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions." Despite the unequivocal statement in the 2020 Proxy that the Code of Conduct applies to the Individual Defendants, for the reasons outlined

---

[2] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

herein, this statement was false and misleading because the Code of Conduct was not adhered to,

as evidenced by the various false and misleading statements alleged herein and by the Individual

Defendants' failures to report violations of the Code of Conduct, including, significantly,

defrauding the government and taking kick-backs relating to that fraud. When the government

launched an investigation into this Conduct, the Individual Defendants concealed this information

from investors until it became impossible for them to continue doing so, as an independent report

had already exposed the information.

79.     Regarding Clover's growth, the Proxy stated the following, in relevant part:

We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

* * *

As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period.

* * *

We've already seen a glimpse of what's possible. Clover currently offers Medicare Advantage plans in 7 states and 34 markets. Our "obvious" plans are among the most affordable in their markets. They generally offer the widest physician networks. As a result, they benefit from industry-leading organic growth, with a 38% annual growth rate compared to an 8% industry average.

80.     Regarding doctor usage of the "Clover Assistant" platform, the Proxy stated, in

pertinent part, that:

[T]he Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark

contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

81.     The Proxy also boasted about Clover's healthcare plans, stating:

The SCH board of directors believes that Clover provides a fundamentally different approach to insurance, offering highly affordable, best-in-class plans that combine wide access to healthcare and supplemental benefits with low out-of- pocket expenses. Clover designs its plans to provide the access of a PPO at lower than HMO costs. Most of its members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with wide network access and with the same in-and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long-term care services in 2016. The SCH board of directors believes that Clover's best-in-class plans will continue to deliver market- leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care.

82.     Under "Risk Factors," the Proxy stated the following as to Clover's risk of

litigation:

From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been

a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

\* \* \*

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti- Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "Risk factors— Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

\* \* \*

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti- Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

83.    Regarding "Sales and Marketing," the Proxy stated the following:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder.

Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

84.    In regard to the "risk adjustment model," the Proxy stated:

When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer- oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

85.    The Proxy was false and misleading because, while it assured investors that Clover's Code of Conduct was followed during the preceding fiscal year, the omissions and non-disclosures during the Relevant Period, as outlined herein, demonstrated that the Individual Defendants did not comply with the stated provisions of the Code of Conduct when filing public statements regarding the affairs of the Company with the SEC. Specifically, the Proxy failed to disclose, inter alia:  (1) the Company made improper payments to healthcare providers in violation of federal anti-kickback laws; (2) the company developed software that aided Clover's practice of defrauding the federal government by unlawfully overbilling; (3) the Company engaged in the deceptive sales practices of a subsidiary to mislead seniors and induce them to purchase healthcare plans; (4) the Company engaged in undisclosed related party transactions with Seek Insurance, which was responsible for most of Clover's sales; (5) Clover had received a Civil Investigative Demand from the DOJ, which posed athreat to the Company in relation to the aforementioned

issues as Clover generated a substantial portion of its revenue from Medicare; (6) a significant amount of Clover's sales had been driven by Seek Insurance and the Company intentionally obscured this fact; (7) the Clover Assistant software was rudimentary; and (8) the Company failed to maintain internal controls.

## FIDUCIARY DUTIES

86.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Clover and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Clover in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Clover and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

87.    Each Individual Defendant owes and continues to owe Clover, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

88.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Clover, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Clover, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

89.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)    remain informed as to how Clover conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

90.    The Individual Defendants, as officers and/or directors of Clover, were bound by the Company's Code of Business Conduct and Ethics[3] (the "Code of Conduct") which required the following:

The Company expects all of its directors, executive officers, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its employees and foster a culture of fairness, honesty and accountability within the Company. The Company also expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf. See Section 15 (Compliance Standards and Procedures) for a description of whom to contact with questions or how to report suspected violations of the Code. Anyone who

---

[3] See Clover Code of Conduct:
https://investors.cloverhealth.com/static-files/51fd1f5a-9ffc-402a-bedb-cf35308c0af3

41

violates the standards in this Code will be subject to appropriate action, which, in certain circumstances, may include (a) for directors, removal from the Board, legal action or referral for criminal prosecution and (b) for employees, termination of employment or service provider relationship for cause, legal action or referral for criminal prosecution.

\*\*\*

6. Legal Compliance All directors and employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. In addition, each employee is expected to comply with all other Company policies and procedures that may apply to employees, many of which supplement this Code by providing more detailed guidance. It is essential that all employees know and understand the legal and regulatory requirements and other standards that apply to the Company's business and to their specific area of responsibility. To ask questions about whether or how any law applies to Company conduct, employees should contact the legal department.

\*\*\*

8. **Gifts and Entertainment Business gifts and entertainment are meant to create goodwill and sound working relationships and not to gain improper advantage with customers or facilitate approvals from government officials.** All employees must be careful to avoid even the appearance of impropriety in giving or receiving gifts and entertainment. In general, an employee cannot offer, provide or accept any gifts or entertainment in connection with an employee's service to the Company except in a manner consistent with customary business practices, such as customary and reasonable meals and entertainment. Gifts and entertainment must not be excessive in value, in cash, susceptible of being construed as a bribe or kickback, or in violation of any laws. This principle applies to the Company's transactions everywhere in the world, even if it conflicts with local custom. Under some statutes, such as the U.S. Foreign Corrupt Practices Act, giving anything of value to a government official to obtain or retain business or favorable treatment is a criminal act subject to prosecution and conviction. For additional information, please see the Company's Anti-Corruption Policy. Additionally, employees should not accept gifts or entertainment that may reasonably be deemed to affect their judgment or actions in the performance of their duties.

\*\*\*

11. **Financial Integrity; Public Reporting**

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's

business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;
- transactions be supported by appropriate documentation;
- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;
- employees comply with the Company's system of internal controls and be held accountable for their entries;
- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;
- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;
- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and
- records be retained or destroyed according to the Company's document retention policies or procedures then in effect. The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with

complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects. In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;
- comply with this Code;
- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;
- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;
- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and
- comply with the Company's disclosure controls and procedures and internal controls over financial reporting. If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction or development that the employee believes may require disclosure, the employee should report the matter immediately.

91.     In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, Garipalli, Turner, and Shapiro ("the Audit Committee Individual Defendants"), owed specific duties to Clover under the Audit Committee Charter (the "Audit Charter").[4] Specifically the Audit Charter provided for the following responsibilities of the Audit Committee Individual Defendants:

1.     Purpose   1.1.   The purpose   of   the   Audit   Committee   (the

---

[4] See Clover Audit Charter at:
https://investors.cloverhealth.com/static-files/abee8883-ab7b-4bcd-8db1-da434fa13ae9

"Committee") of the Board of Directors (the "Board") of Clover Health Investments, Corp. (the "Company") shall be to: 1.1.1. Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company; 1.1.2. Assist the Board in oversight and monitoring of **(i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements,** (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls; 1.1.3. **Provide the Board with the results of its monitoring and recommendations derived therefrom; and 1.1.4. Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.**

*** 

3. Responsibilities In addition to such other responsibilities as may be delegated to the Committee from time-to-time by the Board, the Committee shall: 3.1. Review on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

*** 

3.5 Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC; 3.6 Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10Q, using professional standards and procedures for conducting such reviews; 3.7. Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors; 3.8. Review before release the unaudited quarterly or annual operating results (or financial outlook or guidance) to be stated in the Company's quarterly earnings release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information; 3.9. Review the contents of the officer certifications to be filed with the SEC pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act and the process conducted to support the

certifications; 3.10. Consider the establishment, and oversee the activities, of any internal audit function within the Company; 3.11. Review any reports by management or internal auditors, if any, regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and review before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure; 3.12. Oversee compliance with legal requirements for disclosure of the Company's independent auditor's services and Committee members, member qualifications and activities;

\*\*\*

**3.14. Review, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;** 3.15. Provide oversight and review at least annually of the Company's financial risk management policies, including its investment policies; 3.16. If necessary, institute special investigations with full access to all books, records, facilities and personnel of the Company; 3.17. As appropriate, engage and obtain advice and assistance from outside legal, accounting or other advisors with funding to be provided by the Company; 3.18. **Conduct appropriate review and oversight of related party transactions, as defined by applicable rules of the SEC and Nasdaq Stock Market;** 3.19. Review and assess the adequacy of this Charter and recommending any proposed changes to the Board for approval, on an annual basis; 3.20. Review annually its own performance against the responsibilities outlined in this Charter and as otherwise established by the Board 3.21. Provide a report in the Company's proxy statement in accordance with the rules and regulations of the SEC; 3.22. Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters; 3.23. Review and discuss with management, the independent auditor and the internal auditor, if any, to identify, monitor, and address enterprise risks. **This will include discussion of the Company's major enterprise risk exposures and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board.** The Committee will also oversee and monitor management's plans to address such risks. In connection with its review of enterprise risk, management's assessment thereof and any draft risk factors presented by management, the Committee is entitled to rely on management's identification and assessment of the operational, financial, strategic, regulatory and other risks described…

(Emphasis Added).

## BREACHES OF DUTIES

92.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Clover, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

93.     The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering in connection with the Misconduct. The Individual Defendants also breached their duty of loyalty and good faith by allowing causing the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Clover substantial damage.

94.     The Audit Committee Individual Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Clover's public statements and internal control function.

95.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Clover, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Clover has expended, and will continue to expend, significant sums of money.

**DAMAGES TO CLOVER**

96.     The Misconduct has exposed the Company to myriad reputational and financial damages, including but not limited to:

      (a)     Possible restatements and goodwill impairments;

      (b)     Liability arising from the Federal Securities Class Action;

      (c)     The loss of credibility with customers and suppliers; and

      (d)     Legal and accounting costs associated with litigation, investigations and restatements.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

97.     Plaintiff brings this action derivatively and for the benefit of Clover to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Clover, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

98.     Clover is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.     Plaintiff is, and has been continuously at all relevant times, a stockholder of Clover. Plaintiff will adequately and fairly represent the interests of Clover in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

100.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

101.     A pre-suit demand on the Board of Clover is futile and, therefore, excused. At the time of filing of this action, the Board consists of Individual Defendants Toy, Turner, Shapiro, and

Garipalli (the "Director Individual Defendants") along with non-parties Chelsea Clinton, Demetrios L. Kouzoukas, and William G. Robinson, Jr. Plaintiff needs only to allege demand futility, in respect of a majority (four) of the Directors who are on the Board at the time this action is commenced.

102.    Demand is futile with respect to Defendant Toy because Defendant Toy has served as Clover's President and CTO, and as a Company director since January 2021 and prior to this he held these positions with Clover from March 2019, February 2018, and November 2018. Therefore, he is a non-independent director. Defendant Toy has received and continues to receive his source of livelihood for his role as a director. He is also a defendant the Federal Securities Class Action.

103.    Demand is futile with respect to Defendant Turner because Defendant Turner has served as a Company director since January 2021 and was also a director prior to the Merger from April 2015. He also served as a member of the Audit Committee. Defendant Turner has received and continues to receive his main source of livelihood from the Company.

104.    Demand is futile in respect of Defendant Shapiro because Defendant Shapiro has served as a Company director since in January 2021. He also serves as the Chair of the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee.

105.    Demand is futile in respect of Defendant Garipalli because he is Clover's co-founder and has served as Clover's CEO and as a Company director from January 2021, and prior to that as Clover's President from July 2014 until March 2019. He was a member of the Audit Committee during the Relevant Period. Accordingly, he is a non-independent director. The Company provides Defendant Garipalli with his main source of livelihood and therefore it is very unlikely he would pursue an action against the remaining current directors on the Board, as they

are responsible for approving his compensation at the Company. Defendant Garipalli personally made many of the false and misleading statements and omissions which comprised the Misconduct herein. Defendant Garipalli is also a defendant in the Federal Securities Class Action.

106.    Demand in this case is excused as to the Director Individual Defendants, some of whom are named as defendants in the Federal Securities Class Action. The Director Individual Defendants personally made and/or were responsible for many of the false or misleading statements or omissions amounting to the Misconduct complained of herein. Their involvement in the Misconduct as outlined above would preclude them from acting independently and in the best interests of the Company and the shareholders. The involvements outlined above would preclude the Director Individual Defendants from adequately monitoring the Company's operations and internal controls and call into question the Individual Defendants' conduct. Thus, any demand on the Director Individual Defendants would be futile.

107.    The above directors conducted little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements and omissions. Further, they consciously disregarded their duties to monitor controls over reporting and engagement in the scheme and consciously disregarded their duties to protect corporate assets. For the above reasons, the Director Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not independent or disinterested, and demand upon them is excused as futile.

108.    Pursuant to the Company's Audit Charter, the Audit Committee Individual Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, the Company's accounting and financial reporting practices, and its system of internal controls. The Audit Committee Individual Defendants failed to ensure the integrity of the Company's financial

statements and internal controls, as they are charged to do under the Audit Charter, and instead allowed the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Individual Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

109.    In violation of the Code of Conduct, the Director Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Individual Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Individual Defendants face a substantial likelihood of liability and demand is futile as to them.

110.    Clover has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Clover any part of the damages Clover suffered and will continue to suffer thereby. Thus, any demand upon the Director Individual Defendants would be futile.

111.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Individual Defendants can

claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Board faces a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

112.    The acts complained of herein constitute violations of fiduciary duties owed by Clover's officers and directors, and these acts are incapable of ratification.

**Insurance Considerations**

113.    The Director Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Clover. If there is a directors and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Individual Defendants were to sue themselves or certain officers of Clover, there would be no directors' and officers' insurance protection. Accordingly, the Director Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Individual Defendants is futile and, therefore, excused.

114.    If there is no directors' and officers' liability insurance, then the Director Individual Defendants will not cause Clover to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

115.    Thus, for all the reasons set forth above, all of the Director Individual Defendants cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

116.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

117.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

118.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

119.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

120.    The Proxy stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.  The Proxy was false and misleading because, despite assertions to the contrary, Clover's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

121.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

122.    The false and misleading elements of the annual Proxy led to the elections of all of the Director Individual Defendants, allowing them to continue breaching their fiduciary duties to Clover.

123.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy

124.    Plaintiff, on behalf of Clover, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

125.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

126.    The Individual Defendants, by virtue of their positions with Clover and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Clover and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Clover to engage in the illegal conduct and practices complained of herein.

127.    Plaintiff, on behalf of Clover, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Breach of Fiduciary Duties*

128.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

129.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Clover's business and affairs.

130.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

131.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Clover.

132.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

133.    In further breach of their fiduciary duties, the Individual Defendants failed to

maintain an adequate system of oversight, disclosure, controls, and procedures.

134.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, assuring investors that Clover was on track to flourish as a stand-alone company, but failing to disclose major problems that existed for as long as Clover had, including that: (1) the Company made improper payments to healthcare providers in violation of federal anti-kickback laws; (2) the company developed software that aided Clover's practice of defrauding the federal government by unlawfully overbilling; (3) the Company engaged in the deceptive sales practices of a subsidiary to mislead seniors and induce them to purchase healthcare plans; (4) Clover engaged in undisclosed related party transactions with a field marketing organization,  Seek Insurance, which was responsible for most of Clover's sales; (5) Clover had received a Civil Investigative Demand from the DOJ, which posed a threat to the Company in relation to the aforementioned issues as Clover generated a substantial portion of its revenue from Medicare; (6) a significant amount of Clover's sales had been driven by Seek Insurance and the Company intentionally obscured this fact; (7) the Clover Assistant software was rudimentary; and (8) the Company failed to maintain internal controls.

135.    The Individual Defendants failed and/or caused the Company to fail to rectify any of the wrongs described herein or the false and/or misleading statements and omissions of material fact referenced herein, rendering the Individual Defendants personally liable to the Company for breaching their fiduciary duties.

136.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and

omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

137.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and that internal controls were not adequately maintained, or they acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

138.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Clover has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiff, on behalf of Clover, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Clover.

143.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Clover tied to the performance or artificially inflated valuation of Clover, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

144.    Plaintiff, as a stockholder and a representative of Clover, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

145.    Plaintiff, on behalf of Clover, has no adequate remedy at law.

## **FIFTH CLAIM**

### **Against Individual Defendants**
*for Waste of Corporate Assets*

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Clover will lose financing from investors and business from future customers who no longer trust the Company and its products.

148.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

149.    Plaintiff, on behalf of Clover, has no adequate remedy at law.

**PRAYER FOR RELIEF**

150.    **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Clover, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Clover;

C.    Determining and awarding to Clover the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing Clover and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and protect Clover and its stockholders from a repeat of the damaging events described herein, such actions including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1)    A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2)    A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

3)    Awarding Clover restitution from Individual Defendants;

4)      Awarding Plaintiff the costs and disbursements of this action,

including reasonable attorneys' and experts' fees, costs, and expenses; and

5)      Granting such other and further relief as the Court may deem just

and proper.

Dated: July 21, 2021

Respectfully submitted,

**BIELLI & KLAUDER, LLC**

/s/ Ryan M. Ernst
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
(302) 803-4600
rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Correy A. Kamin
Ryan Messina
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Eric Wiegand*